

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-18-00032-CR

CEDRIC LEVONE JAMES, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 17-0111X

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Chief Justice Morriss

## OPINION

In a jury trial, Cedric Levone James was convicted for evading arrest or detention with a motor vehicle. After James pled true to the State's enhancement allegation, he was sentenced to fifteen years' imprisonment. On appeal, James argues that the trial court erred in admitting evidence during the guilt/innocence phase of his trial that he was a registered sex offender who had previously evaded arrest. Because we conclude that (1) there was no abuse of discretion in admitting evidence that James had previously evaded arrest and (2) James was not harmed by the admission of evidence that he was a sex offender, we affirm the trial court's judgment.

*(1)     There Was No Abuse of Discretion in Admitting Evidence that James Had Previously Evaded Arrest*

Justin Clark, a patrol officer with the Marshall Police Department (MPD), testified that, on January 13, 2017, he attempted to pull over a white 2006 Nissan Altima after it failed to signal a turn at an intersection. Instead of yielding to Clark's lights and sirens, the vehicle sped off, leading Clark on a chase at speeds of up to 100 miles per hour through residential areas. Video of the chase demonstrated that the Nissan was occupied by three men, including Anthony Gatson.

Gatson, who had been convicted of multiple felonies and was incarcerated at the time of trial, explained the events leading up to the chase. He testified that his friend, Donald Ray Green, was "down on his luck" and requested that Gatson assist him in stealing from several local businesses. Gatson agreed, and the duo hatched a plan to commit several thefts throughout town. Green introduced him to a man named "Ced," who drove Gatson and Green around town while they executed their plan.

2

Gatson testified that he was in the car when police attempted to make the stop and that "Ced" drove off against Gatson's will, leading MPD on the high-speed chase that ended at a railroad track after a passing train blocked their getaway. While "Ced" escaped from the vehicle and ran away, Gatson and Green were apprehended by police and arrested. Video of the incident showed that one of the vehicle's occupants had thrown a bag of drugs from the window and that drug paraphernalia was found in the car after the apprehension. At trial, Gatson was equivocal when asked to identify James as the driver, stating merely, "He look[s] like the dude, but . . . I'm not really sure."

Because the chase occurred late at night, Clark could not then clearly see the Nissan's driver, who successfully escaped the scene before the other occupants were apprehended. The video recording included no image of the driver. However, both Clark's testimony and the video of the incident demonstrated that Gatson, when questioned by MPD, identified the driver of the vehicle as James. Additionally, Clark testified that the license plates on the car were registered to James.

Through James' questioning of both Gatson and Clark, James implied that Gatson, in an attempt to save himself, spoke James' name on the night of the incident not because he actually knew him to be the driver, but because the name was suggested to him by Green and the MPD. Gatson testified that (1) he heard Green tell police that the driver's full name was Cedric James, (2) MPD repeated the name to him, (3) he merely recited James' name to MPD when asked, and (4) he did not know whether the driver was actually James. However, Clark testified that Gatson identified James before his name was spoken by anyone.

3

To that point during the trial, Green had not complied with the State's subpoena requiring his presence, leaving only Gatson's and Clark's testimony on the element of identity. As a result, the State asked the trial court to allow Clark to testify that James was a registered sex offender who had failed to register his vehicle with his compliance officer. Counsel objected to the State's introduction of this evidence on the grounds that it was irrelevant, that it constituted an inadmissible extraneous offense, and that its probative value was substantially outweighed by the danger of unfair prejudice. The State responded that it needed to introduce the evidence to explain why James would have a motive for evading arrest. Over those objections, the trial court permitted Clark to testify that James was a registered sex offender who was required, but failed, to inform his compliance officer that he was driving the 2006 Nissan Altima.

For purposes of showing *modus operandi*, the State then sought to introduce the testimony of Cory Adkinson, a patrol officer who attempted to stop the same vehicle twenty days before the incident in this case. The State informed the trial court:

> [T]he same vehicle ran the same route, [the] driver got stopped at the same train tracks, [and he] jumped out and ran down the same path . . . .
> And he's going to testify that about two hours later, Cedric James called in and reported his car was stolen, and he -- when he went over there to take the report from him, that he was wearing the same pants as the man that had got out and ran away, but he had taken off his shirt and his jacket.

James objected on grounds of "relevancy, as to speculation" and that the probative value of Adkinson's testimony was substantially outweighed by the danger of unfair prejudice. James further added that the evidence failed to establish *modus operandi* because, unlike the prior incident, James had not reported the car stolen on January 13. The trial court overruled James' objections.

4

Adkinson, an officer with MPD, testified that, on December 29, 2016, he observed a white 2006 Nissan disregard a stop sign and evade arrest when Adkinson tried to initiate a traffic stop. He added that the driver sped from "Norwood to Highbridge to Ralph Street to Evans Street" and to the train tracks, a strikingly similar route to the one taken January 13. Adkinson testified that the driver abandoned the vehicle and fled on foot when he came across the train tracks. Although he was unable to detain or locate the driver, whom Adkinson described as an African-American male in a dark-colored jacket and pants, the car's license plates were registered to James. According to Adkinson, he received a call from James, who reported that his car had been stolen. When Adkinson spoke to James about his stolen car, he noticed that James, an African-American male, was wearing dark-colored pants. After watching MPD's video of the January 13, 2017, incident, Adkins testified that the driver who evaded arrest December 29, 2016, escaped using the same route.

Green appeared in the courtroom by the time Adkinson had concluded his testimony. Green, who had been convicted of five felony offenses and had been in prison for most of his life, testified that he paid James to drive Gatson and him in James' white car on January 13. Green said that he had never met James before the incident and that he still did not know his full name. However, Green positively identified James as the driver who evaded arrest.

"A trial judge's decision on the admissibility of evidence is reviewed under an abuse of discretion standard and will not be reversed if it is within the zone of reasonable disagreement." *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011) (quoting *Davis v. State*, 329 S.W.3d 798, 813–14 (Tex. Crim. App. 2010); *Russeau v. State*, 291 S.W.3d 426, 438 (Tex. Crim. App.

5

2009)).  Abuse of discretion occurs only if the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree."  *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *see Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).  We may not substitute our own decision for that of the trial court.  *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).  We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case.  *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

### a.       *Rule 104(b)*

When called on to rule on admission of extraneous-offense evidence during guilt/innocence, the trial court must initially decide, under Rule 104(b), whether a jury could reasonably find beyond a reasonable doubt that the extraneous offense was committed.  *Fischer v. State*, 268 S.W.3d 552, 556 (Tex. Crim. App. 2008) (citing *Harrell v. State*, 884 S.W.2d 154, 160 (Tex. Crim. App. 1994)).  Citing Rule 104(b) and his initial "speculation" objection, James contends that the trial court erred in its assessment.  However, we conclude that James has failed to preserve any Rule 104(b) issue for our review on appeal.

When, as in this case, "the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.  The court may admit the proposed evidence on the condition that the proof be introduced later."  TEX. R. EVID. 104(b). A trial court may admit questioned evidence as conditionally relevant, carrying along the proponent's accompanying duty to establish that relevancy at a later time.  *Rawlins v. State*, 521 S.W.3d 863, 868 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing *Powell v. State*, 898

6

S.W.2d 821, 829 (Tex. Crim. App. 1994)). In such a case, if the sponsor of the evidence fails to later establish relevancy, the opponent must renew his original objection to the evidence and request that the trial court instruct the jury to disregard the evidence. *Id*. (citing *Powell*, 898 S.W.2d at 829). Without such an objection, no complaint is preserved for appellate review. *Id*. at 868–69 (citing *Powell*, 898 S.W.2d at 829; *Williams v. State*, 82 S.W.3d 557, 563 (Tex. App.—San Antonio 2002, pet. ref'd); *Heidelberg v. State*, 36 S.W.3d 668, 673 (Tex. App.—Houston [14th Dist.] 2001, no pet.)).

Before the instant testimony, James merely raised a "speculation" objection. On appeal, he argues that James "was objecting that the State could not prove that James was guilty of this extraneous offense beyond a reasonable doubt." Because our appellate record reflects that James did not argue that the State failed to present sufficient connecting evidence after Adkinson's testimony, we find his Rule 104(b) issue unpreserved.

   b.   *Rule 404(b)*

Next, James argues that Adkinson's testimony violated Rule 404(b). "[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." *Carson v. State*, 515 S.W.3d 372, 374 n.3 (Tex. App.—Texarkana 2017, pet. granted) (quoting TEX. R. EVID. 404(b)). However, evidence of "other crimes, wrongs, or acts" may be admissible if that evidence has relevance apart from its tendency "to prove the character of a person in order to show action in conformity therewith." *Id*. (quoting TEX. R. EVID. 404(b)). "Rule 404(b) sets out an illustrative, not exhaustive, list of exceptions to the prohibition

7

against admitting evidence of extraneous offenses including 'proof of . . . identity.'" *Daggett v. State*, 187 S.W.3d 444, 451 n.13 (Tex. Crim. App. 2005) (quoting TEX. R. EVID. 404(b)).

James argues, "Evidence of James committing the same offense 20 days prior is not probative of any of these elements. Rather, the prior offense is simply evidence of James' propensity to commit the offense." We disagree. James' opening statement clarified that the element of identity was the main issue in this case. "Once [James] placed his identity in issue, the State could offer evidence of an extraneous offense to prove his identity if there was some distinguishing characteristic common to both the extraneous offense and the offense for which [he] was on trial." *See Hartsfield v. State*, 305 S.W.3d 859, 871–72 (Tex. App.—Texarkana 2010, pet. ref'd). The State introduced Adkinson's testimony for this purpose.

"A distinguishing characteristic is usually the accretion of small, sometimes individually insignificant, details that marks each crime as the handiwork or modus operandi of a single individual." *Id*. at 871–72 (quoting *Segundo v. State*, 270 S.W.3d 79, 88 (Tex. Crim. App. 2008)). "No rigid rules dictate what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode or manner of commission of the crimes, . . . or any other elements which mark both crimes as having been committed by the same person." *Id*. at 872.

"If the ruling [on admissibility] was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made, then we must uphold the judgment." *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005). Before the trial court's Rule 404(b) ruling, the State had presented evidence that James' vehicle was used to evade arrest twenty days before the January 13, 2017, incident. The trial court heard that, in each instance, the

8

perpetrator led MPD on a high-speed chase, took the same roads during the chase, abandoned his vehicle—in fact, the same vehicle—at the same train crossing, and fled on foot. In light of this evidence, we cannot conclude that the trial court abused its discretion in performing its analysis under Rule 404(b).

     *c.*     *Rule 403*

Evidence that is admissible under Rule 404(b) may nonetheless "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403; *Mozon v. State*, 991 S.W.2d 841, 846–47 (Tex. Crim. App. 1999). In our Rule 403 analysis,

> we should consider (1) how compellingly evidence of the extraneous offense serves to make a fact of consequence more or less probable, (2) the potential that the extraneous offense will impress the jury in some irrational but indelible way, (3) the trial time needed to develop the evidence, and (4) the proponent's need for the extraneous offense evidence.

*Hartsfield*, 305 S.W.3d at 873 (citing *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002)); *see Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *Montgomery*, 810 S.W.2d at 389–90. These factors "are known as the *Montgomery* factors." *Douglas v. State*, 489 S.W.3d 613, 627 (Tex. App.—Texarkana 2016, no pet.). Rule 403 favors admissibility, and "the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery*, 810 S.W.2d at 389; *see also De La Paz*, 279 S.W.3d at 343. As with Rule 404, a trial court does not abuse its discretion when it admits or excludes evidence pursuant to Rule 403 so long as its decision is within the zone of reasonable disagreement. *See De La Paz*, 279 S.W.3d at 343–44.

Here, due to sufficient similarities between the extraneous and primary offense, Adkinson's testimony regarding the extraneous offense was very probative of the issue of identity. "While . . . extrinsic crimes are by their nature prejudicial to the defendant," the jury was instructed that the extraneous-offense "evidence was admitted only for the purpose of assisting [the jury], if it [did], for the purpose of showing the defendant's motive or identity, if any." *Hartsfield*, 305 S.W.3d at 873. Absent contrary evidence, we presume that the jury followed the instructions given. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). Accordingly, we presume the jury followed the instructions not to consider James' extraneous offenses for the purpose of proving or tending to prove that he committed the instant offense. Additionally, specific testimony regarding the extraneous offense comprised less than eight pages of transcript. Finally, James' identity as the perpetrator of the January 13, 2017, offense was a contested issue. Given that Gatson and Clark, who could not positivity identify James, were the only two witnesses to testify before the trial court admitted the extraneous-offense evidence, the trial court could reasonably conclude that the State had a great need for the evidence.

After weighing the *Montgomery* factors, we conclude that the trial court's decision to admit the extraneous-offense evidence in this case fell within the zone of reasonable disagreement and thus was not an abuse of discretion. Accordingly, we overrule James' Rule 403 argument.

Because we overrule James' Rule 104(b), 403, and 404(b) challenges to the extraneous-offensive evidence, we find that the trial court did not abuse its discretion in admitting evidence of the December 27, 2016, incident. We overrule James' points of error related to the admission of this extraneous offense.

10

*(2)*     *James Was Not Harmed by the Admission of Evidence that He Was a Sex Offender*

James also argues that the trial court erred in admitting evidence, over his Rule 403 objection, that he was a registered sex offender. Although James concedes that the evidence "had some probative value as a possible motive for James' evading arrest," he argues that it was substantially outweighed by the danger of unfair prejudice. Sexually-related misconduct is inherently inflammatory. *See Montgomery*, 810 S.W.2d at 397. But, even assuming error,[1] we conclude that James was not harmed by the trial court's admission of this evidence.

"The erroneous admission of extraneous-offense evidence is not constitutional error." *Graves v. State*, 452 S.W.3d 907, 914 (Tex. App.—Texarkana 2014, pet ref'd) (citing *Higginbotham v. State*, 356 S.W.3d 584, 592 (Tex. App.—Texarkana 2011, pet. ref'd) (citing *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007)). "Rule 44.2(b) of the Texas Rules of Appellate Procedure provides that an appellate court must disregard a nonconstitutional error that does not affect a criminal defendant's 'substantial rights.'" *Id.* (quoting TEX. R. APP. P. 44.2(b)). "An error affects a substantial right of the defendant when the error has a substantial and injurious effect or influence on the jury's verdict." *Id.* (quoting *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). We will not reverse based on nonconstitutional error if, after we look at the whole record, we conclude that there is "fair assurance that the error did not influence the jury, or had but a slight effect." *Id.* (quoting *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

---

[1]The State could have established motive by showing that James was required to register his vehicle without notifying the jury that James was a registered sex offender.

11

Our harm analysis should consider the full record, with all evidence, the nature of that evidence that supports the verdict, the alleged error's character, and how the "error" fits with the other evidence. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *Motilla*, 78 S.W.3d at 357; *Graves*, 452 S.W.3d at 914. A harm analysis may include overwhelming evidence of guilt. *Graves*, 452 S.W.3d at 914.

The State's exchange with Clark regarding James' sex-offender status comprised less than one-half page of transcript, and the State did not elicit the specific facts of that offense, but mentioned it once during closing argument.[2] Taken alone, Gatson and Clark's failure to identify James as the perpetrator did not supply overwhelming evidence of guilt. These facts favor a finding of harm.

However, the jury watched the audio/video recording on which Gatson provided MPD with James' full name. Further, Adkinson's testimony establishing *modus operandi*, including the fact that the abandoned car belonged to James, constituted strong circumstantial evidence of James' identity as the perpetrator. Critically, Green positively identified James as the driver who evaded arrest. The strength of the totality of evidence indicates that evidence of James' sex-

---

[2]The State engaged in the following exchange with Clark:

> Q       Officer Clark, are you aware of Cedric James's status as a registered sex offender here in Harrison County?
> A       Yes, ma'am.
> Q       Okay. And are you aware that part of the registration requirement for someone that's required to register as a sex offender is that they have to let their officer know about what kind of car that they drive?
> A       Yes, ma'am.
> Q       Okay. And to your knowledge, had he registered that car with his sex offender officer?
> A       Not that vehicle, no, ma'am.
> Q       Not that vehicle. Okay.

offender status was of minor importance.  After reviewing the entire record, we conclude that it was unlikely that the jury's finding of guilt was adversely affected by the admission of evidence that he was a registered sex offender.  Therefore, we overrule this point of error.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     June 21, 2018
Date Decided:       July 19, 2018

Publish